Good morning, Your Honors. May it please the Court, Alexandra Deaves on behalf of Mr. Lynch. Your Honors, there are a number of issues on the table here today. My plan is to begin with a discussion of the appropriations rider, then move on to Mr. Lynch's right to present his defense, and finally address the government's cross-field issues, ideally preserving some time for rebuttal. Unless the Court prefers that I take a different approach, I will start with the appropriations rider. Thank you. Let me get right to the crux of the matter, which is why, based on the existing record, Mr. Lynch demonstrates that the rider applies to his case, and even if this Court is not convinced of that, why, at a minimum, he's entitled to a McIntosh hearing. So, of course, the precise question under McIntosh is whether Mr. Lynch strictly complied with all of the relevant state medical marijuana laws. And at the time that he operated the Central Coast Compassionate Caregiver medical marijuana dispensary in Moore Bay, California, that was 2006 to 2007, there were only two relevant state laws, and that was the Compassionate Use Act, the QL, and the Medical Marijuana Program Act, the MMPA. And under those laws, as we know from very clear California decisions, it is perfectly legal to operate a storefront medical marijuana dispensary, such as the one that Mr. Lynch had, so long as it is operated on a not-for-profit basis. So really what this comes down to is a question of whether that's what Mr. Lynch was doing. Can I ask, just to figure out where we're headed? Yes. Your ultimate goal is to persuade us to decide, as a matter of law, that he was in strict compliance? Do you think we have an adequate record to do that? Absolutely, Your Honor. Either because the record is adequate, even if the burden is on us, but more so because we believe that the burden of proof of persuasion is on the government, which in district court did not avail themselves of any opportunity, but just without an opportunity to say they had additional evidence. Let's say that we conclude that the burden is on your client to prove by preponderance of the evidence that he was in strict compliance. In that scenario, do you agree that we would need to send it back to the district court to hold the evidentiary hearing that he himself said was necessary? No, Your Honor, and I'd love in a moment an opportunity to persuade the court otherwise on the burden of proof question. But even assuming the burden is on us, the government has represented in other cases where they've made that argument that it would only be by a preponderance standard. So what does operating as a not-for-profit mean? Well, it really comes down to a question of intent, and we know this both from the definition of a non-profit and from California law. And there I'm referring to the Mitchell case that was cited in our briefing, where the question of whether it was run as a not-for-profit wasn't really about whether it made a profit, but whether the intent was to run it as a not-for-profit. And the definition of a not-for-profit organization is really just a group that's organized for some purpose other than to make a profit. Again, intent. So the only evidence on this point in the record, and I believe this point is not disputed, is Mr. Lynch's declaration that he presented at sentencing. A sworn declaration where he stated that he set up the dispensary not to make money but to help people. In fact, he never even recouped his costs in his investment in the dispensary. There's evidence in the record that he ran a discount program for people who could not afford the medical marijuana. In fact, there's evidence that he sometimes gave it away for free to people who could not afford it. There's evidence in the record that when he found that some of the product in the store did not seem like it was up to medical grade standards, he threw it away. He trashed it. He did not sell it. So this all is perfectly adequate evidence on which to find that Mr. Lynch was operating on a not-for-profit basis. But I'm sorry, do you think that's the end of the inquiry? Because I guess I thought there were some suggestions that at least around the periphery, let's say, that there wasn't strict compliance. Well, at least that's the argument the government made. Is the court referring to these other actors such as Mr. Baxter? That kind of thing. Sure. Does that come under the umbrella of patent-option-strict compliance, or do you say that's just irrelevant and we just focus on the… Well, I don't think it really matters, and here's why. These other individuals' conducts should not be attributed to Mr. Lynch unless this was part of some sort of conspiracy where he was agreeing to that conduct. There's certainly no finding below that. In fact, there's an alternate finding that I think this court would apply clearly erroneous standard to, which is at the sentencing memorandum where the district court determined that Mr. Lynch did not know about any of this. Okay. I'm just trying to figure out what strict compliance means. Does it mean that basically, if you had the burden, you would have to show that really everything done in the course of however… I can't remember how long this thing was open, but of course, let's say a year or a year and a half of operation, that everything was done by the books and there was never a point at which to… No, I don't think that at all, Your Honor, although if that is the standard, I believe we need it. But no, first of all, McIntosh very clearly said he wasn't talking about irrelevant state laws. So there are all sorts of laws that might apply to a business, but the relevant ones, when we're talking about the appropriation rider, are going to be medical marijuana laws. Here, I don't believe there are any other relevant laws other than the CUA and the MMPA. And why does MENSH not apply here? Thank you, Your Honor. MENSH is about pre-MMPA conduct. It's a 2008 decision where… So it postdates the MMPA, but the conduct in it was pre-MMPA, and there the court said… I'm not as familiar with the acronyms as you are. You're running through some things pretty quickly there. I'm sorry, Your Honor. Let me slow down. In 1996, the people of California passed a proposition enacting the Compassionate Use Act. That allowed for individuals, effectively, to use medical marijuana and primary caregivers to assist with that. That's what MENSH said. It's limited to that. That's what MENSH is all about, the primary caregiver. Right, but you're saying it's not a primary caregiver. No, Your Honor. He, at the time, thought it might be, but we can see that it's not the case. But that doesn't matter because under the Urza Siena and Al-Kamadel cases and several others, California courts talk about when a defendant is not… or a medical marijuana dispensary defendant is not a primary caregiver, they can nonetheless be protected under the law under the Medical Marijuana Program Act. And that is the 2003 law that the state legislature passed that clarifies and… Is that the one that deals with cooperatives? That's exactly right. That allows for the collective… So it's okay to have a cooperative, then? That's right, and it doesn't even mean… So is this a cooperative? Yes, Your Honor. The MMPA doesn't actually use the term a cooperative. It just says the Collective and Cooperative Use of Medical Marijuana by Qualified Patients and Primary Caregivers. It's the later attorney general… But I mean, that just seems categorically different from a store. Theoretically, it might, but the California state courts have held the opposite. There are several cases on this point, that would be Urza Siena, Anderson, London, Colvin, Al-Kamadel, we cited several in our briefing, that are quite clear that a storefront medical marijuana dispensary can be… Is this a briefing to this court or a briefing to the lower court? Both, Your Honor. Where's the briefing done? I read all the briefs. It took me a while. Thank you, Your Honor. I appreciate that. This would be in the motion and reply on the McIntosh issue that we filed. So I do, Your Honor, believe… Okay, I mean, the fact that a storefront can be a co-op doesn't tell me that every storefront is a co-op. Those are two different things. So how do we know that this is a co-op? Sure. What does it have to do to be a co-op under California law? Right, so I would not use the term a co-op, because a co-op would be a term that would make sense. A collective. Or either, you know, the term a collective. If you're using collective broadly, then any corporation might be a collective. Well, the reason I'm making the distinction is this. I do agree that after 2008, there are guidelines. I don't think that they count as relevant state law, because they're not binding. But there are guidelines that would say that in order to be lawful under those guidelines, there would need to be certain steps that an organization would need to take in order to make themselves into a formal collective or co-op. But the language that predates that, that Mr. Lynch was operating under, simply says collective and cooperative as adjectives. Use of medical marijuana. And that just leaves us no place. Well, I don't think it does, because we have perfectly clear guidance from the California courts, including post-AG guidelines, that say these collectives, up to 5,000 people in Colvin, over 1,500 people in Jackson. Okay, so how many people were involved in this cooperative? I believe it was about 2,300. And these same cases make clear... And the 2,300 Mr. Lynch's cooperative became members of the cooperative by doing what? By signing up, by presenting their doctor... How is that different from a pharmacy? How is that different from going to CVS and being a member of a local CVS, because they've got... Well, when I go... Provider of medication. Thank you, Your Honor. When I go to a pharmacy or CVS, I don't sign up with a membership agreement where I'm agreeing to certain conditions. So this was set up in that way. And these same California state cases make it very clear that the members of the collective or the cooperative, so to speak, don't need to participate in it. They can simply be providing monetary donations, as it's called. They can be paying for the medical marijuana. This is all okay. This was envisioned by the QA and the MMPA, which were expressly trying to find ways for patients who might not be able to grow their own medical marijuana to receive it. Now, someone running a dispensary isn't supposed to be profiting off of it. But you can have reasonable salary. You can recoup your expenses. If we thought that you were right that the writer applied here, what do we do? Thank you, Your Honor. Yes, if the court believes that the writer applies on the record itself, I would ask the court to issue an order preventing the Department of Justice from spending any additional funds on this case so long as the writer is in effect. And so Mr. Cobol then doesn't get to argue. We just have a blank table. We still hear your appeal and have to decide the appeal, but without the benefit of government participation. We strike the government's brief. This is a very, very odd situation. Congress put us in a very, very awkward situation to try to enforce a writer in this way, when it's a don't pay for doing X kind of thing. Yes, Your Honor. And they didn't tell us to do away with the appeal. They didn't tell us it doesn't violate the law. They just told us that the Department of Justice can't be paid for pursuing it. So now what? Sure, Your Honor. And of course, we attempted to ask the courts to address these claims much sooner when we would be at quite this point in time. McIntosh has construed the writer in such a way that some of these problems arise, but I do want to step back for a moment and just appreciate what the writer was intended to do. It was intended to stop these prosecutions entirely. Right. It comes in very, very late. It comes in, what, 2014? Yes, Your Honor. So this was already well down the road at that point on this one. That's right. So what happens to things that are in the middle of an appeal? Well, I think Kleinman addresses that, that once the case is on appeal, that doesn't mean that the writer doesn't apply. The Department of Justice can no longer spend funds on that case. Okay, so tell me what happens now. Yes. So, I mean, in some ways it's up to the court how it wants to address that matter. We do believe that any further work on this case in any way should… Let me get this more directly. Sure. What would you like us to do? Well, I would like the court, Your Honor, because… You want us to strike the government's brief? That would be one thing, Your Honor. Do we deem everything that you've argued admitted by the government because it's now no longer appearing? We deem all the answers waived? I don't think we need to go that far, Your Honor. Do we vacate the conviction? Yes, let me address that, Your Honor, because I believe that would more precisely answer the court's question. Of course, in Kleiman we recognize that this court held that the immediate consequence of enforcement of the writer is not that the conviction gets vacated. However, we are making a slightly different argument here than was made in Kleiman, and I do think it has some force. That is, let's say this court issues the order that we've asked for. We don't see how it's possible for the government to comply with that order short of an order dismissing the case. Someone has to monitor the case. Some de minimis expenditures need to happen, and that is unlawful under the Anti-Deficiency Act and the Constitution. In fact, every time it's done, it's actually a felony. And so the government has never responded to this argument. Perhaps if they can respond to it today and explain precisely how they can comply with the order without a dismissal. I didn't follow the argument, so now I can restate it? Yes. So you're assuming that maybe we were going to affirm the conviction and just— Certainly not, Your Honor, and I do see my time is getting low, so I would like to get there. No, no, that's not what I said. I mean, obviously, if we reverse the conviction, your client can be re-prosecuted as things stand now because they can't spend the money to do it. But so I don't understand. How would we otherwise dismiss the case if we were to uphold the conviction? I'm sorry. Not just dismiss the appeal. Return it to the district court for an order to dismiss the underlying conviction. That would be simply enforcing an order of this court. But Kleiman says we can't vacate the conviction on the basis of this right. Kleiman says that if the right applies, that does not mean that your conviction is vacated. What I'm saying, Your Honor, is that if the order is put into place, we would be simply asking for an enforcement of that order, and we don't see any way that the government can possibly comply with that order short of the case being dismissed. But the court doesn't need to do that, Your Honor. I don't get it. Why? Because they're going to necessarily have to spend some funds on this existing case that's out there. Someone's going to be monitoring it. Someone's going to be maintaining it. I just don't see how it's possible for – Okay. Let me just – I'm trying to figure out where I'm not connecting with you. Let's say that we were going to affirm the conviction. I'm not saying that's what we're going to do. But let's say we were to do that. I actually think we have to decide the merits of the appeal because that massive red brief was filed well before this right took place that went into effect. So all of the government's arguments opposing your main intentions and appeal are before us. So if we have to resolve those other merits, and we did – Yes. If we would somehow affirm the conviction, then – I don't understand. Why would the case get dismissed at that point? Does the right apply to BOP? Yes, Your Honor. BOP is an arm of the DOJ, and so certainly Mr. Lynch could not be put in custody while the right was enforced. Now, that does not mean that the case needs to be dismissed. However, in my earlier argument, we don't see how the government can continue monitoring this case without spending funds on it. But even – let's put that argument aside. Simply with the rider in place, either we're going back for a new trial. That cannot happen, or Mr. Lynch cannot be incarcerated. I do see that I'm getting short of time. I'm happy to answer further questions on the rider, including the burden of proof, or should I move on to the – I think you should move on to your other arguments. This is a very complicated issue, and I appreciate the time that you've taken. Thank you for giving it to me, Your Honor. Let me talk about Mr. Lynch's right to present a defense. This claim encompasses several, evidentiary and instructional, and legal errors all kind of wrapped up together. I'd like to focus on one in particular here today, and that is one of the jury instructions, the one on the third element about affirmative misleading. And the reason for that is threefold. First, I think the errors are clear under this Court's and Supreme Court precedent. Second, there's no dispute this is preserved. And third, it's clearly not harmless in light of the government's argument and cross-examination. And let me tease out those three points. So in district court, Mr. Lynch, the defense properly proposed language that would have told the jury that the DBA official's assertions could be expressed or implied. And that language very clearly comes from Babergeek, from Cox, from Raley. I'm sorry, this all goes to the question of the stopper? Correct, Your Honor. This was the key issue in trial, was whether Mr. Lynch could prove his entrapment by a stopper defense. He effectively took the stand and admitted the elements of the crime. So this case is all about the entrapment by a stopper defense. And so one of the elements is that the person he contacted at the DEA gave him an assurance that what he was going to do. The last element, counsel, of the stopper, even if you could meet everything else, is whether the reliance is reasonable. Yes, Your Honor. How could this possibly be reasonable? He makes a blind call to DEA, doesn't know the name, asks them a general question about what they're going to do, and on the basis of that decides to open a marijuana dispensary? Your Honor. What possibly could make that reasonable? Sure, Your Honor. I think the facts are a bit more complicated than that. Let me try to lay them out. I do also want to step back for a moment and note that reasonable reliance is a quintessentially factual question. And so if the court is suggesting that as a matter of law Mr. Lynch shouldn't have been able to make out his defense, we do believe that that's a factual question for the jury, and even if the evidence is weak, inconsistent, insufficient, or of doubtful credibility, Mr. Lynch had a right to present it. But let me answer the question factually. The evidence was that Mr. Lynch was interested in opening a medical marijuana dispensary because there wasn't one in the county. And he did some research. He looked at the relevant California legislation, and that led him to look at the Tenth Amendment. And he found the Tenth Amendment very powerful, and he viewed it as a supreme law. But then he went to the DEA's website, and there he saw stuff about scheduled wine, and Mr. Lynch is a layperson. He didn't have an attorney at this time, and so he was confused. How is it that I see all of these dispensaries operating? How is it the California legislature is saying this is legal, but I'm seeing contrary information? And he thought about this for some time and ultimately came to the understanding that although marijuana is illegal under federal law, there is an exception under California law for medical marijuana, and that is granted by the Tenth Amendment. And so this was his understanding that this is legal, as a lay understanding. But Mr. Lynch was not satisfied with just coming to his own conclusion, I'm going to go up and open the dispensary, as I think many people do. This case is unique because he actually—and there's no dispute about this because of his phone bill—he actually then calls the DEA. And it's not just one phone call, Your Honor. So he makes his first phone call, and the person who answers he asks him this question about medical marijuana dispensaries. And they say, where do you live? And he tells them where he lives so they can direct him to a local field office. So he calls his local office, and he asks the question again. And they say, no, you need to call this number, and give him the main number in Los Angeles. So he thinks he's being directed to someone who presumably can answer his call. He calls this third number in Los Angeles, and the answer is that he's getting another phone number. This time he calls him, and his testimony—which, of course, the jury could find credible—his testimony is that the person who answers, a woman answers the call. And she says marijuana task force. And Mr. Lynch asks this question, what are you going to do about all of these medical marijuana dispensaries? And she puts him on hold. And then a man comes on. Now, Mr. Lynch's impression here is that this person now, on his fourth phone call, has been brought on by the person, marijuana task force, to answer his question. And he asks the question. And the answer is it's up to the cities and counties. And Mr. Lynch is still not satisfied. He wants to make his intentions clear. And so he says, what if I want to open up my own medical marijuana dispensary? And the person slows down and seems to be getting a little perturbed, was the word. And he says, it's up to the cities and counties how to handle the matter. Mr. Lynch hangs up the phone. This is consistent with his understanding of the law that he came to. He then reaches out to his local officials, and he follows all of the rules that they've given him. That is certainly reasonable reliance, particularly in light of the underlying cases. Talmadge, Baberge, Cox, Braley—these are the Ninth Circuit and Supreme Court cases—were on much weaker facts. The courts have found entrapped by self-approved as a matter of law. So surely this was a question at least for the jury. And we have that. They didn't actually say, you can do this. A lot of those cases did. They said, stand here. And maybe standing there was illegal. But they said, I'll stand there. I think the only case that was actually that expressed was the Cox case. In Talmadge, for example, the defendant—this was one of the federal firearms licensee cases. And it was actually the FFL who asked the defendant, well, don't you have a felony? And he said, oh, yeah, but that was reduced to a misdemeanor. It's no problem. And the response was, oh, then it's no problem. That was enough to establish it as a matter of law. Yeah, you may at least be dealing with coherent historical facts. But Mr. Lynch did not present sort of the accurate facts when he asked the question. That's a different element than I questioned you on, which was the reasonableness of reliance. But he had called them and said, I'm thinking about opening a dispensary. And I hope to have at least 2,300 subscribers in this co-op. And I'm going to sell a lot of marijuana. Sure, Your Honor. Respectfully, I think that position conflicts with this Court's decisions in Talmadge and also Battersea. I mean, Talmadge is where the historical facts language comes from. It's nowhere in the Supreme Court cases. Really, it's about getting enough information that your reliance can be reasonable. And there, in both Talmadge and Battersea, the key fact on which the defendants, the legality of the conduct turned was nowhere said. In fact, those defendants made some false statements, or at least the Talmadge one did, in the form that he filled out. So I really think that under those cases, the facts that he provided, I'm planning to open up a medical marijuana dispensary, are sufficient. The person who answered the phone did not say, I need to know more. How big is this going to be? Are you going to do this? Yeah, I did have a medical marijuana dispensary. We don't even know if we're talking to a lawyer. We don't know who we're talking about. He doesn't get a name. It doesn't need to be a lawyer or a precise name. It simply needs to be someone, we say under Rayleigh, with apparent authority, but even with actual authority. This is the DEA. This is precisely who one would go to. I mean, these federal firearms licensee cases are weaker, because the defendants aren't going to the ATF. They're just going to their local gun dealer. But here he actually called the DEA. I mean, this is certainly apparent, if not actual authority. And if I might just return to the real problem here on the express or implied point, that the cases are very clear that it can be an implied assurance. And the government made precisely the types of arguments that Your Honor is making here today to the jury. And the jury may well have bought them, but that's not what the law says. And so we have a combination of inaccurate jury instruction, leaving out the express or implied part, and the government's argument that together misled the jury and gave them improper instructions. May I ask you a question about jury nullification? Yeah, please, Your Honor. So we – Kleinman seems to me to go a long way towards supporting your argument. At least that's the one portion of the statement that the district court jury made during voir dire. But Kleinman then, of course, says that it's subject to harmless error analysis. And I guess I'd like to hear why you think the error wasn't. I assume that's what we'll hear from the judge on. Yeah. Thank you, Your Honor. There are a few reasons it wasn't. But just as a preliminary matter, the government had the opportunity to address harmless error in the second cross-appeal briefing. Kleinman did not – additionally didn't avail themselves of that opportunity when we made that point in the 28-J letter to this court a few weeks back. So we believe that they waived it or at least not met their burden. But putting that aside, so in Kleinman, a large part of the harmless error analysis was that this was just a small part of the instructions. There was no emphasis on this coercive instruction. Very different in this case, Your Honors. This was a standalone instruction, forcefully given, and then the jury was pulled on it. The prospective jurors were pulled on it individually so that the court could confirm with each of them one by one whether they would agree to it. And then the instructions were later repeated as well. So that's different from Kleinman. In addition, Kleinman noted there was no dispute over the adequacy of the instructions overall there. Kleinman had an additional instruction taken from another case. It said the source was two cases forth. And the first one, which was largely what was done in this case, is the one that Kleinman approves. That is not an improper instruction. The jury has a duty to decide the law. It was that second part, which I don't believe was given here, that Kleinman disapproves. I believe I should correct the court, Your Honor. So in Kleinman, there were five different sentences given, three of which were acceptable and two were not. In this case, the three acceptable ones were given, plus the additional one that's not. And here's what was said here that falls under Kleinman. Nullification is by definition a violation of the juror's oath, which, if you are a juror in this case, you will take to apply the law as instructed by the court. And Kleinman found that as true. That's true, right? I'm sorry? That's true, right? Well, what Kleinman found is that an instruction like that is coercive. I would respectfully disagree that it's true. I think we go back to the original understanding of the Sixth Amendment. But given Kleinman, we don't even need to go there. No, Kleinman found that a very similar instruction is unduly coercive. Which was? In Kleinman, the similar part was you would violate your oath and the law if you willfully brought a verdict contrary to the law given to you in this case. So, Your Honors, and of course, there were two problematic instructions in Kleinman. But the one that the court really focused on for purposes of harmless error was this one that was similar to what we have here. And finally, Your Honors, we have juror statements in this case that are part of the record that say that this instruction was problematic and actually had an impact on them. So we do think that the analysis here is distinct from Kleinman and that the government has not met its burden to the extent they haven't already waived the matter on harmless error. Are there additional? I see that I'm over my time. I'm going to allow you some time because we're going to hear from the government on the sentencing question. I will give you some time to respond on that. Thank you, Your Honor. I appreciate that. I'm going to make a quick data call to the United States. Let me just summarize the government's position on the two issues that have been discussed. On the jury notification issue, Kleinman supports the jury instruction here. As the court emphasized, most of the instruction here was approved by Kleinman, and the instruction here doesn't have the problematic aspects that were disfavored in the Kleinman case. And I'll go through those with you. Just one about violating the oath. Yes, sir. And the problem in Kleinman was that at an additional phrase, you will violate your oath and the law if you engage in jury notification. And what the court in Kleinman reasoned was that may imply to a juror that you're going to get in trouble, especially in the context of a criminal case, that there's going to be punishment for you if you do that. So that and the law portion was not in the instruction in this case. It was the oath, just the oath part. And why wouldn't a reasonable juror understand that violating the oath might get you in trouble as well? Well, because, first of all, there's not the reference to the law. Second of all, the court needed to do that as part of its obligation under this court's law to try to forestall jury instruction – jury notification. And let me – no, no, no. It just needed to say the first part, which we've approved, and Rosenthal, I think it was. Right. Going further and saying you would violate your oath if you were to do this is – I read it as being precluded from Kleinman. Two things, Your Honor. First, in Rosenthal, they specifically used that language. Not the oath. Yes, they did. And it comes from the Thomas case in the Second Circuit, where it defines what jury notification is. No, no, no. I'm talking about in terms of not what the court said in the opinion. I'm talking about what the court actually told the jury there. I understand, Your Honor. But I'm just explaining where this language comes from and why in this context it's appropriate. I'm just making sure. Sure. Am I remembering this right? That in Rosenthal, what Judge Breyer said to the jury, he didn't have the thing about the oath. Correct. Okay. However, the Rosenthal case says jury notification is by definition a violation of a juror's oath. Right. But you can't tell the juror that is what I'm saying. And the reason why you can't is this. You just had a juror who had injected jury notification into the case, as the court found through the actions of the defense. So there's a discussion on the record about jury notification. So the court needs to define to the jury. And, by the way, these jurors are about to take this oath. So there were no idea proceedings. So the court has to explain, this is what notification is. This is what you just heard about. And if you are going to nullify, you're about to take an oath that says you can't nullify. That's what the court may not do under climate. No. I just disagree with your reading that the law part is the key. I think the key is suggesting to the jurors that if you were to engage in jury notification, you might be subject to punishment. And I think that the statement, you would violate your oath if you do this, is just as powerful a suggestion, at least. It's not expressed, but it's certainly implicit. Climate specifically says that the concern is being punishment in the context of a criminal case. And the words, in the law, have- I don't think there's anywhere in climate that you can point to that says the key thing here was the in the law statement. No, it said the key thing is the punishment. The implication that, yeah, if you were to engage in this behavior that I just told you is not okay, you might be subject to punishment. That's what gives that coercive ring to it, right? Well, I don't think so. Because if you're taking an oath and you're going to say- jury notification is saying you're not going to live up to this oath. It's just a simple, definite fact. And I guess the other thing is if you go that far with your reading of climate, then courts, in this situation, where someone is talking about jury notification, have no other means to explain to the jury and forestall the- they have a duty to forestall jury notification. I think those first three sentences in Rosenthal are more than adequate to explain to the jury what their obligations will be. The court doesn't need to go further and threaten implicitly that there will be punishment involved if you were not to follow my instructions, right? Can I ask you- because I don't think you're going to persuade me on this point, actually. Have you waived the harmlessness- the question whether this error was harmless by not briefing? Um, um, excuse me here. I'm just trying to remember exactly what we argued in the brief. You did not argue in that monster red brief anything about whether, assuming this was error, it was harmless. And I guess your opponent obviously has stood up here today as if you waived that. Well, I'm saying- I would say, obviously, no. We were describing the facts of what happened and why, in this context, it was correct and not problematic. And I would submit to that as the basis why it should not be waived. And I don't think that there should be a waiver found in this case, particularly when our thrust of it was that this was proper in context, based on all the other things that happened. And the extent that you're saying, as a matter of definition, that those words can be problematic, I'm saying, given the context here, given all the things that happened, given the difficulty that was going on in this court here with problems about whether you can follow the law and what you can do, that this was appropriate, that it couldn't be seen as coercive, and given all the other instructions that came in, where the court consistently allowed counsel to say that you can make the final decision yourself, the judge is instructing that you shouldn't take what I say as to be- to imply what the decision is, that that did not have an effect on this case. On the right here, let me just try to make it simple, because there are some complicated issues we can get to right through. The district court in this case found that this defendant did not comply with state law. It did so after hearing- looking at all the cases the defendant is relying on now, after looking at all the facts the defendant is relying on now, understanding full well the two theories of state law compliance the defendant has- we've talked about today, and found definitively that he did not comply with state law. In what regard? What did he do? He said that he was not a collective or cooperative, and- well, the fact that he gave the conclusion, he failed to comply with state law. And he did that note saying both- it's spelling out, there are two ways you can comply with state law, the collective theory and the primary caregiver theory. Let me go back and give you some background for what happened. Can I just- I'm remembering the later statement on the- maybe it was in the motion for an indicative ruling, was that I would need to hold an evidentiary hearing to figure this out, right? Well, first of all, he didn't address the issue of whether his- about his actual finding. He didn't discuss that in contact. He was talking about, well, if the court tells him to do this, we can have- but he didn't specifically address that, nor could the court have jurisdiction to go back and take a second crack at the apple in that hearing, even if he did. So, again, it's a conclusive finding. It was a finding made after four sentencing hearings, and it was a finding made on a huge record. I'm talking about the district court's finding in the sentencing memorandum. I don't think the records support that he walked it back, that he looked at that and said, okay. But we hadn't even decided, Mackintosh, that that might happen. No. Right, so how could the- Just because the consequences of the finding matter doesn't mean that the finding- I would put way more weight on the court's later statement in the motion for an indicative ruling, where the issue that would need to be resolved is squarely keyed up, where the court says, boy, this is really complicated. I would need to have another entry. Well, he wasn't clearly saying that my factual findings were different or things like that. And I would also suggest, if the court was saying that, it would be agreed with you. The court would have said, oh, well, this is easy. I've already decided. Again- That's not what the court said. I would say it would be improper for the court to have him. If we were having an argument about that and the court never raised the issue of what about my finding here and what's the preclusive effect, that never comes up in the indicative hearing. So my point to you is the court can't do that. You can't go back and have two bites of the factual apple, particularly when the specific issues are fully litigated by the parties based on the same facts and the same law. It can't just be that because later down the road that finding may give the defendant the sentence the court wanted to give them versus the sentence that's required by law that we allow them to go back and do it again. And let me just explain what happened at sentencing so you can just see why this should be a preclusive finding. The government argued, as part of its argument in terms of the sentencing factors, that the defendant had failed to comply with state law. It said he was never a primary caregiver, which was the only theory the defendant ever used when he was in operation. He called the store the compassionate caregivers. He had everyone who came into his store sign this form saying he was their primary caregiver. I think that they're not arguing today that he was a primary caregiver. That's correct. What about their other arguments? They've changed their theory after the district court. It's a legal conclusion though, right? That's correct. The court also found that he was inconsistent with the other theory in the district court. The government also said he couldn't use the collective and cooperative theory because the facts didn't fit it. I think as we summarized it, he was more like a Costco than he was a cooperative. The defendant did not sit on their laurels and say that they conceded in their sentencing papers that he never made any effort to be a collective or cooperative. As a matter of fact, they only argued that he was a primary caregiver, and they tried to argue the law with the court that, or at least he reasonably believed he was a primary caregiver. In addition, I'm sorry. A reasonable belief wouldn't be enough. No, it wouldn't under McIntosh. You have to fully, completely, and strictly comply. And McIntosh specifically addressed the issue of whether or not. They argued they waived it in effect by not, or forfeited it in effect by not. Not only did they forfeit it, but I'll explain in a second. They did have an expert try to convince the court of it at the time, and the court specifically rejected that based on the facts of the case. So they did argue. No, they didn't. Their position was always, I'm a primary caregiver. During the lengthy sentencing hearings, they also presented this man, Mr. Elford. They switched their positions, so it gets a little complicated. At the sentencing hearing, they said, we'd like Mr. Elford to come, who has a different theory about his legal compliance. The court listened to him, rejected the theory, said that's not what happened at all. So they did present it, in a way. I suppose they did. We're not saying that this was our theory, but they did present it to the district court. But they conceded the point in their sentencing papers, and never withdrew that, never said to the court, let's go. For sentencing hearings, they maintained that. Then, the district court rejects this position, looks at the facts, saying this isn't what happens. In the sentencing paper of the district court, clearly is aware of both theories. Lays out theory one about primary caregivers. Lays out theory two about collective and cooperatives. In its footnote, it says it agrees with the government that he did not comply with state law. Again, it says he's agreed with the government. Says that he put himself forward as a primary caregiver. And the later Supreme Court of California case showed that he's not a primary caregiver. But he says there was some confusion in the law during the time, so he might have reasoned to believe he was a primary caregiver. Under McIntosh, the reasonable belief doesn't matter. But I'm more concerned about the cooperative. Yes. Because that's what they're arguing today. Right, and my point is the court knew both theories. He was presented with both theories, and found he didn't comply with state law. And then what happened was McIntosh, the rioter came down, and when they came back on their indicative motion, they attached an amicus brief from the same expert who had come to the district court, and said, district court, we know you said he didn't comply with state law, but you just made a mistake between the two theories, between the collective and cooperative theory and the primary caregiver. So he really did comply with state law. And our position, both in the district court and here, is that you can't switch theories like that. You can't tell the district court you're complying under one theory and not under the second theory. So they've sort of switched positions on a fairly second level. The district court, when it made its findings, we were both— But we can affirm cases on alternative grounds if they're legal grounds. If you're doing X and it violates one thing and doesn't violate something else. Well, I'm just—when someone comes to court and says, my theory is this but not that, and then switches positions later on, you can say you're bound by your first position. Counsel, was there—I thought there was a suggestion here that they were selling to minors and that that would have violated California law. No, that's not part of the theory. We've laid out in our brief the other—there are other violations of California law. That in itself was not one. Okay. Are there other violations of California law? I thought you said there were just two. It wasn't a co-op and— Oh, there's two theories. There are numerous ways in which he failed to be a cooperative. And we've laid those out. For example, it wasn't joint ownership. It's not just that it was not that he was a non-profit. It was not a joint ownership. It wasn't a closed circuit. It was a joint ownership? Yes. I thought you were a cooperative under California law. I haven't read these cases because they're buried in the briefing somewhere, but she says there's cases that meet the facts of this. I disagree with that conclusion. We don't look at those cases. They're not going to cover where there's not joint ownership. And I'll just say those cases were all presented to the district court. To Judge Wimu. To Judge Wimu. He saw all those cases. He quoted many of those cases. He quoted the Uranescu case, which counsel has talked about, the Hockendale case. He looked at all that law and found it wasn't good enough. In addition, as we've set forth in our brief, there are multiple other facts in the record that fully support Judge Wimu's finding. Just a quick question. Do you agree with your opponent's statement that DOP is the fact-covering copyright? No. Oh, excuse me. It is in the sense that— I can't say that I've researched all that, but I'm assuming for a matter of days. Would you like me to address why this case— can I actually go into the retroactivity? Totally. But I thought we resolved that in Kleinman. No. Okay. No. So let me explain Kleinman. And I think it was not fairly presented in the sense that Kleinman reserved the issue of whether DOP— Oh, no, I know that. But the retroactivity question, I thought we had to— No. I mean, Kleinman specifically said that it would not apply in— it could apply in that appeal before it because the appeal hadn't happened— the rider hadn't acted before— I mean, I know that in your case, obviously the appeal started long before the rider. And so your position is that because you already had— both sides' notices of appeal had already been filed, but the rider just is never going to apply? That's correct. What Kleinman says is that you can't spoil the funds spent on the prosecution going forward by something that happens now. That's one of the reasons they said you can't vacate the conviction in Kleinman. And our point is you would be spoiling the government's resources and efforts in prosecuting the appeal if you say you're cutting off the appeal. We would say— Oh, yeah, no, no. I was just trying to figure out if we were to affirm the conviction and the sentence. He was going to have to be in prison. Obviously, that's a going forward thing. Could DOJ through DOP spend money in prison? And I thought the answer might well be no. Actually, that couldn't happen. The answer is yes, one, under the time rationale that that would be frustrating all the resources that went into the conviction and the judgment, which says send this person to prison right now. In addition, I do believe that the general rule against retroactive application of statutes would work. The reason why all these things is complicated and these line-drawing things are happening is because you're trying to change the legal consequences of something that's happened before. The general rule of statutory interpretation, which was relied on in many different contexts, is that you only apply statutes going forward. And the test for that, the test is whether if you do something new, you're going to change the legal consequences of something that's already happened. Well, I mean, I grant you that conviction can't be vacated. We know that from my mind. But I don't understand why—imprisoning is a totally forward-looking thing. Well, it certainly would change the legal consequences of what the judgment and the conviction means. And so that would be a retroactive effect. And there's just no way you can say that the judgment says you have to go to prison isn't changed in the consequence matter. They say you don't go to prison. In fact, even the timing has changed. Now, usually that is handled in criminal cases, these kind of complicated issues, through the saving statute, which we lost in crime, and although we've tried to preserve our argument. But— By the way, are you in a position for a certain imprisonment? No, no, no. That's fine. Yeah, that's fine. But still using just the general principles of retroactive analysis, which have been used in criminal matters as well, the same result should apply. Does that make sense? At least do you see— I think I see why the court left it open. And I would say, if you look at the Landgraf case, for example, I think Justice Sieben says when judges have to do these retroactivity analyses, I think he said you can't do it with philosophical precision. I would just give you sort of the practical idea that if you have— you've spent all this effort on a conviction and you've had a poor issue, you've had this court affirm the conviction and send it back, of course it has to be a retroactive effect if that can't have any practical effect in the real world, that the person can't go to prison. And the point is, if Congress wanted to do that, they can. But the rule is they have to say so. They have to say so. Because we say, this will apply going forward or to this date, and they do this all the time. So it's not meaning that Congress can't do this, can't create these sort of complicated problems. It's that courts have said for hundreds of years, we assume that we operate statutes going forward, not going backwards. Counsel, is it clear that we can enforce the Anti-Deficiency Act? Is it clear that we have the power to enforce this right? I mean, certainly McIntosh seems to assume that we can. But I didn't see that we actually sort of squarely confronted that question as to how we do this. I mean, there may be other riders. For example, if Congress said no money shall be spent further on the Afghan war, I'm not sure how we'd get standing. But do the courts have the power to prevent the President from taking some kind of emergency action if it might affect Afghanistan? I mean, the enforcement of these riders is a very, very difficult question. And if it comes up under the Anti-Deficiency Act, that's usually something the Attorney General would have to enforce. And then the enforcement might come into court. But what right does the court have to say, you can't be here today, Mr. Koval, you've got to pick up your stuff and walk out of the door, and we're not going to listen to you? I agree it's complicated. And I agree that McIntosh didn't really address it. Did or did not? Did not. He left it to the district courts to sort of figure it out, to what we do with this. I've looked at the anti-deficiency law. I can't really find a case that sort of answers the issue. We did in our litigation, there was some question of whether the anti-deficiency law would require a dismissal. I argued in some of the motion work in this case. Is there a Chevron issue lurking here as to what the rider means? Do they have to defer to the agency as to whether this comes within the rider or not? I hadn't considered that complication as well. And there are always these sort of lurking separation of powers issues about who's forcing what person to do it. Does the rider apply to us or just applies to you? It doesn't say anything about courts. The case of Nixon answers that. This court had a case where the defendant said that the probation office can't prevent me from smoking medical marijuana, I believe, and the district court said it doesn't apply to courts, it only applies to DOJ, and this court affirmed. And that's another reason why you should be able to fully handle this appeal without concern about the rider. But, Your Honor, I can't say that I've had opportunity to fully brief that or consider all the implications of the anti-deficiency statute. I don't think there's a lot of law on it at that time. I don't know if that satisfies the court's questions. The last point I'll just make is much of the presentation in the defendant's brief, we found factually did not fairly reflect the record. There are times, for example, where in the discussion of the Baxter case and one of the hearsay questions where they point to a government question as raising a charge of fabrication under the hearsay rules. That question never came into evidence. There were some objections and they didn't do that. So I could go through some of those, but unless there's another point that the court wants. I think we've gone through quite a bit. Thank you, Mr. Cole. Ms. Yates, I'll give you two minutes. I'll do my best, Your Honors. We expected you to go through that whole thing in two minutes. I'm sorry. Never mind. Your Honors, let me just focus on the appropriations rider for a moment, although if I have time I'd love to hit jury nullification. But the Court's absolutely correct that the district court here when we brought our 12.1 motion said no, I need a hearing in order to find this. And of course that's the case because at the trial itself the Court repeatedly used language like anti-issue, red herring, irrelevant to talk about compliance. So this wasn't an issue that was litigated. Now, Mr. Lynch attempted to put some sympathetic evidence before the Court at sentencing, but he was never given an opportunity to demonstrate compliance. And at the 12.1 hearing the Court clearly found that he could. The Mensch case, the district court simply made a mistake by relying on that and just misinterpreted the law. Despite the fact that Mr. Lynch had made his position clear, he initially through his attorneys had talked about how he operated as a primary caregiver. But before the district court made its sentencing ruling, long before he submitted a declaration by Mr. Elford and even presented Mr. Elford at his sentencing hearing to explain, you know, we were a little confused about the California law ourselves. Actually the reason he was legal is because he was operating as a collectively and cooperatively under the MMPA. There's no sort of waiver there. There's no change. And I really do want to just step back to the big picture for a moment, because I think it's pretty extraordinary what the government's asking here. The entire point of this appropriations rider was to protect people like Mr. Lynch from prosecution and punishment. We know that because the actual authors of the rider, Representatives Farr and Rohrabacher, have written to this Court and filed an amicus brief saying Mr. Lynch is one of the precise people that actually we were intending to protect by this. He is the poster child for medical marijuana. In the Kleinman decision, the Court didn't say there's no way he could have been compliant. It was about this extra sales out-of-state. That defendant was in no way complying with the law the way Mr. Lynch was. He truly, without hyperbole, was the poster child for medical marijuana. So to say that he's not even entitled to a hearing, to have an opportunity to demonstrate his compliance, I think really flies in the face of what the legislating that Congress has done here. And I would point the Court to that Rohrabacher and Farr amicus brief as well, because I do believe it discusses somewhat Congress's authority to legislate through appropriations and why that's wholly permissible. Did the Court want me to just briefly address the jury nullification issue? I think we've heard adequate on that. I'm more concerned about the mandatory 5 years. I'm very concerned about it as well, Your Honor. Yes. One can have considerable sympathy for Judge Wu's perspective, but I'm wondering how you can really reconcile it with the law. Just to be fair here, counsel, and I think Judge Rogers' question is a very good one. You should go ahead and address it. Because this is a cross appeal, I will give the government a minute to respond to you. Of course, Your Honor. I understand. So a couple points. First is that the question of whether someone is subject to a role enhancement is a factual question that this Court has repeatedly over and over again said is subject to clear error review. So this is the type of issue that this Court gives deference on. And if the Court here did that, it would be in good company. If the facts are conceded and the only issue is what the meaning of the statute and the sentencing guideline, if that were the case, you know, I'm visiting by designation here, but I mean in most circuits that issue would then be de novo. Well, Your Honor. It's a pure legal issue of assume you have these facts. Yes, but the application of this guideline to Mr. Lynch is more of a mixed question of law and fact, and particularly his ---- I wonder how mixed it is. You say just say this is enough, assume, this is the legal question I have, assume that there's enough evidence so that if this was illegal activity, he would have been a supervisor. Well, I think what my ---- Then can it be that he no longer ---- can it be under the statute and its interrelation with the sentencing guideline, can it be that there's discretion not to apply that language in the statute which incorporates language in the ---- that's a question you've got to answer by looking at cases, not by looking at the record. Yes, Your Honor. I guess I'm not ---- If the issue is something that we resolve by looking at cases and statutory language and legislative history and all of that, instead of looking at what's in the record of this case, then our review would be de novo, wouldn't it? Well, we respectfully disagree, Your Honor, and think that it is clear, but even assuming it's de novo or perhaps abuse of discretion, if you look at the guidelines themselves, 3B1.1 also interacts with 1B1.3, so that is the relevant conduct guideline. And the argument that we've made here is even if the district court got this wrong legally on the basis that it looked at, this court can affirm on any basis supported by the record. And if you look at the relevant conduct properly under the guidelines, the participants, which it's a very broad view under the guidelines, and we've argued you could go quite broad to the State of California, but the court doesn't even need to go there. Just taking the dispensary itself, the CCCC, we are having involvement of the mayor, the city council, the city attorney, doctors, lawyers, et cetera. Mr. Lynch was not supervising any of these people. In fact, many of them were giving him instructions. But as you say, that's not the rationale of the district court. That's not, which is why if this court disagreed with the rationale and didn't think it could simply affirm on the record, it should do what the court did in the Washington case. And in that case on which the government relies heavily, the district court initially followed logic similar to what the district court here followed. This court didn't reverse and remand with instructions to impose the mandatory minimum sentence. It reversed and remanded with instructions to reconsider whether the rule enhancement applies with the court's proper guidance. And what happened in Washington when it went back to the district court is the district court followed precisely the analysis I've laid out here. You look at the relevant conduct. Look at the participants. It's a bit broader. Found that Mr. Washington under that view and looking at the evidence should not have a rule enhancement. Again, applied the safety valve, and the government did not appeal that. So at a minimum, it should go back. It's hard to, I mean, it looks from the record like the judge would have loved to have done that but didn't feel like he could do it. So he went with an even more exotic theory. So you may not, even if you got that relief, it might not get you very far. It may not, Your Honor, but we do believe that with a factual question that is typically subject to clear error review and is deferential, at the very least the district court should have the opportunity to pass on that in the first instance. Thank you. Thank you, Your Honors. I appreciate the extra time. Good. Thank you. Counsel, I'll give you a minute if you want to respond on the one question. Sure. On whether there should be a remand, I think the law is clear. This is a mandatory guideline enhancement once the facts are met. The facts have been conceded, as the Court said. But let me get to the other issue that you raised, Judge Rogers. You're concerned about the five-year minimum. Do you want to let me know more so I can try to address the question? I just wondered whether there was an answer to your argument. The argument that? That we have to reverse because the enhancement was not applied. I misunderstood. I thought you meant just sort of in an equitable sense. That's not what you were saying? No. Again, I think that the facts are clear. I have read Judge Watford's case on standards review, Garcia-Ruiz, and there is an application process that goes here. But when you have a guideline where the Supreme Court has said, in the Dunnegan case, that factual predicates met, you must apply the guideline. There's really no room for application here. You've had concessions as to the facts. You have the district court finding the facts needed, therefore, remand for further facts or not. Thank you. Thank you, counsel. We thank counsel for its excellent briefing and excellent arguments today. This is a very, very complicated case, and we appreciate your extra efforts today. The court has completed its docket for the week, and we stand adjourned. All rise.
judges: Rogers, Bybee, Watford